BRETT E. LEWIS (BL6812)
LEWIS & LIN, LLC
45 Main Street, Suite 608
Brooklyn, NY 11201
Brett@ilawco.com
Telephone: (718) 243-9323
Facsimile: (718) 243-9326

Attorneys for Plaintiff
WALTER ARNSTEIN, INC.,
d/b/a THE NATURAL SAPPHIRE COMPANY,



## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X

WALTER ARNSTEIN, INC., d/b/a THE NATURAL
SAPPHIRE COMPANY,

                                    Plaintiff,

-against-

TRANSPACIFIC SOFTWARE PVT. LTD.,
PRASHANT
TELANG,

                                  Defendants.

---------------------------------------------------------------X

Index No.: 11-CV-5079-RMB

**FIRST AMENDED
COMPLAINT FOR
CYBERSQUATTING;
DEFAMATION; TORTIOUS
INTERFERENCE WITH
PROSPECTIVE ECONOMIC
ADVANTAGE; VIOLATION
OF 17 U.S.C. § 512(f);
FRAUDLENT
MISREPRESENTATION;
PRIMA FACIE TORT**

**JURY TRIAL DEMANDED**

Plaintiff Walter Arnstein, Inc., d/b/a The Natural Sapphire Company, by its attorneys, for its

complaint against Defendants TransPacific Software Pvt. Ltd., ("TransPacific"), and Prashant

Telang ("Telang"), alleges as follows:

## Subject Matter Jurisdiction and Venue

1. This is an action for cybersquatting under 15 U.S.C. § 1125(d); for misrepresentation of infringement under 17 U.S.C. § 512(f); for defamation under New York common law; for tortious interference with prospective economic advantage under New York common law; for fraudulent misrepresentation under New York common law; and for prima facie tort under New York common law. This Court has subject matter jurisdiction over the claims pursuant to 15 U.S.C. § 1121, and 28 U.S.C. §§ 1331 and 1338.

2. This Court has supplemental jurisdiction over the claims in this Complaint that arise under state statutory and common law of the State of New York pursuant to 28 U.S.C. § 1367(a) because the state law claims are so related to the federal claims that they form part of the same case or controversy and derive from a common nucleus of operative facts.

3. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as a substantial part of the events or omissions giving rise to the claim and the threatened and actual harm to Plaintiff occurred in this District by reason of Defendants' conduct as alleged below. Venue is also proper in this Judicial District pursuant to 28 U.S.C. § 1391(d) because Defendants are aliens.

## Parties and Personal Jurisdiction

4. Plaintiff Walter Arnstein, Inc., d/b/a The Natural Sapphire Company ("Natural Sapphire Company") is a New York corporation with its principal place of business located at 6 East 45th Street, 20th Floor, New York, New York, 10017.

5. Defendant TransPacific is an Indian company with a principal address believed to be 207, Madhva, Bandra Kurla Complex, Bandra (E), Mumbai – 400 051, India.

6. Defendant Telang is an individual residing at 21, 2nd Floor, Aradhana , R K Patkar Co-Op. Housing Society Ltd , Off Turner Road , Bandra (W) , Mumbai - 400050 India.

7. Defendant Telang and Defendant TransPacific ("Defendants"), each are working together and have worked together as a single entity, and in collusion with each other, for the purpose of perpetrating the unlawful activities complained of in this Complaint.

8. At all times material to this action, each of Defendants was the agent, servant, employee, partner, alter ego, subsidiary, or joint venture of the other Defendant, and the acts of each Defendant were in the scope of such relationship; in doing the acts and failing to act as alleged in this Complaint, each of the Defendants acted with the knowledge, permission, and the consent of the other Defendant; and each Defendant aided and abetted the other Defendant in the acts of omissions alleged in this Complaint.

9. Defendants are subject to the jurisdiction of this Court by virtue of having transacted significant business in this judicial district related to the causes of action presented. Defendants further subjected themselves to this Court's jurisdiction by invoking the benefits and protections of this Court's judicial authority in an attempt to cause harm within the State of New York. Their September 2, 2011 letter to Natural Sapphire Company's hosting provider attempted to disable access to Natural Sapphire Company's website via a false copyright infringement claim, and specifically noted that the purportedly infringing material was "likely residing on your servers in your New York data center."

### Background

10. Natural Sapphire Company is a third-generation, family-owned company, specializing in sapphires and sapphire jewelry.

3

11. Natural Sapphire Company adopted THE NATURAL SAPPHIRE COMPANY™ as a trade name in 2004, when Michael Arnstein, the founder's grandson and current Chief Executive Officer, moved the business almost exclusively online.

12. On or about March 30, 2004, the company registered the domain name <thenaturalsapphirecompany.com>, which it still has registered, and uses in connection with its sapphires, sapphire jewelry, and its on-line retail store services featuring sapphires and sapphire jewelry.

13. On November 25, 2004, Natural Sapphire Company asked Telang to register the domain name <NaturalSapphireCompany.com> (the "Domain Name") on its behalf.

14. Telang registered the Domain Name in the name of "Michael Arnstein, 55 West 45th Street, 5th Floor, New York, NY 10036.

15. As recently as January 29, 2011, the Domain Name was still registered in the name of Natural Sapphire Company's Chief Executive Officer, Michael Arnstein.

16. Two days later, on January 31, 2011, Telang replaced Michael Arnstein's contact details with his own.

**The Business of Plaintiff**

17. Natural Sapphire began using THE NATURAL SAPPHIRE COMPANY in commerce in the United States as a mark in connection with its sapphires, sapphire jewelry, and on-line retail store services featuring sapphires and sapphire jewelry as early as December 31, 2004.

18. Since that time, Natural Sapphire Company has used the trade name and mark THE NATURAL SAPPHIRE COMPANY™ continuously in commerce in the United States in

connection with its sapphires, sapphire jewelry, and on-line retail store services featuring sapphires and sapphire jewelry, and has spent considerable time, money, and effort in promoting and developing customer recognition and goodwill in the United States and elsewhere of its trade name and mark THE NATURAL SAPPHIRE COMPANY™ in connection with its sapphires, sapphire jewelry, and on-line retail store services featuring sapphires and sapphire jewelry.

19. Natural Sapphire Company has spent approximately $1 million in advertising its sapphires and sapphire jewelry under the trade name and mark THE NATURAL SAPPHIRE COMPANY™, and has advertised and promoted its sapphires and sapphire jewelry under and in connection with the mark THE NATURAL SAPPHIRE COMPANY™ through a variety of media.

20. In particular, Natural Sapphire Company has advertised and promoted its sapphires, sapphire jewelry, and on-line retail store services featuring sapphires and sapphire jewelry under and in connection with the mark THE NATURAL SAPPHIRE COMPANY™ through the use of "organic" keywords and through the purchase of keywords from the GOOGLE AdWords program, as well as similar programs sponsored by other search engines, such as the YAHOO! and BING search engines.

21. Since 2004, Natural Sapphire Company's keywords purchased from the GOOGLE AdWords program have resulted in approximately 1.7 million clicks and 1.6 million impressions.

22. In addition, many of Natural Sapphire Company's organic keywords are ranked as the #1, #2, or #3 keyword, and are worth millions of dollars in sales each year.

23. Natural Sapphire Company also has advertised its sapphires, sapphire jewelry, and on-

line retail store services featuring sapphires and sapphire jewelry under and in connection with the mark THE NATURAL SAPPHIRE COMPANY$^{TM}$ through the use of print advertisements in Avenue magazine, which is directed at a sophisticated and high net-worth readership in the New York region.

24. Further, numerous print and internet articles about the sapphires and sapphire jewelry that Natural Sapphire Company sells under and in connection with the mark THE NATURAL SAPPHIRE COMPANY$^{TM}$ have appeared in many national print and internet publications, including, but not limited to, The New York Times, ABC News, CBS News, New York Post, Reuters, BBC, USA Today, The Wall Street Journal, Daily News, The New Yorker, National Geographic, Luxxist, The Independent, Bloomberg Businessweek, Luxx, and Organic Style.

25. Likewise, numerous television stations have featured segments about the sapphires and sapphire jewelry that Natural Sapphire Company sells under and in connection with the mark THE NATURAL SAPPHIRE COMPANY$^{TM}$, including, but not limited to, CNN, ABC News, Fox Five News, Good Morning America, and The Wendy Williams Show.

26. Natural Sapphire Company also has distributed press releases about its sapphires and sapphire jewelry, routinely distributes promotional material to its customers that displays the mark THE NATURAL SAPPHIRE COMPANY$^{TM}$ with the shipments that they order from Natural Sapphire Company, and has attended industry trade shows in the past.

27. Video clips from some of the television segments easily are accessible on Natural Sapphire Company's website by way of the following link: http://www.thenaturalsapphirecompany.com/Sapphires/Company/Press/.

28. By virtue of Natural Sapphire Company's long and substantially exclusive use and

extensive promotion of THE NATURAL SAPPHIRE COMPANY™, the mark has
become distinctive for the company's sapphires, sapphire jewelry, and on-line retail store
services featuring sapphires and sapphire jewelry, and Natural Sapphire Company has
achieved sales in excess of $20 million from its sapphires and sapphire jewelry sold
under and in connection with the mark THE NATURAL SAPPHIRE COMPANY™
since 2004.

29. In order to protect its valuable common law rights in and to the mark THE NATURAL
SAPPHIRE COMPANY™, Natural Sapphire Company has applied to register the mark
THE NATURAL SAPPHIRE COMPANY™ with the United States Patent and
Trademark Office on the Principal Register under Section 2(f) of the United States
Trademark Act, 15 U.S.C. § 1052(f), in connection with its sapphires, sapphire jewelry,
and on-line retail store services featuring sapphires and sapphire jewelry, based on the
distinctiveness the mark has acquired.

30. As such, Natural Sapphire Company acquired valid common law rights in its mark THE
NATURAL SAPPHIRE COMPANY™ long before Defendants hijacked the registration
of the Domain Name on or about January 31, 2011.

### The Defendants and Their Wrongful Conduct

31. Natural Sapphire Company hired Defendants in March, 2004 to design its website,
currently located at www.thenaturalsapphirecompany.com (the "NSC Website"), and to
develop software to be used in connection with the website.

32. Plaintiff also instructed Defendants to purchase a number of domain names on Natural
Sapphire Company's behalf for use in connection with Natural Sapphire Company's
business.

33. Telang purchased the Domain Name on behalf of Natural Sapphire Company on or about November 25, 2004, using Natural Sapphire Company's corporate credit card.

34. The Internet WHOIS directory lists Natural Sapphire Company's CEO, Michael Arnstein, as the registrant of the Domain Name from 2006 through January 2011.

35. Telang, the founder and sole owner of TransPacific, was primarily responsible for the work performed by Defendants for Natural Sapphire Company.

36. Natural Sapphire Company compensated Defendants for their work in the amount of approximately $240,000USD per year.

37. On May 14, 2008, the NSC Website experienced a severe technical error involving the non-display of images for multiple products, which Telang attempted to blame on NSC personnel despite the fact that NSC was not responsible for any of the NSC Website code at that time.

38. On January 1, 2010, Telang posted a document on a public TransPacific website containing confidential details of the development process for the NSC Website.

39. On April 30, 2010, Telang implemented an unapproved image viewer element on the NSC Website, which still had multiple bugs and severely impaired the user experience for NSC's customers.

40. Natural Sapphire Company was forced to terminate its relationship with Telang on or about January 5, 2011 as a result of Telang's failure to cooperate and to perform his duties as required.

41. Soon thereafter, the NSC Website repeatedly became disabled—and still to this day becomes disabled—as a result of Telang's attempts to harass Natural Sapphire Company, disrupt and disparage its business, and extort money from the company. During the

development of code for the NSC Website, Telang installed multiple "backdoors" that allowed him to gain remote access to the live version of the NSC Website on Natural Sapphire Company's server. On multiple occasions, Telang used these backdoors to disable or harm the NSC Website by, inter alia, deleting entire tables of data from Natural Sapphire Company's database, deleting all the image files used in the NSC Website, lowering all prices on the NSC Website by 75%, and deleting whole sections of NSC Website. In addition, Telang also architected a "kill switch" into the code written for Natural Sapphire Company's inventory management application, such that the application would not start unless certain files were present on a remote server he controlled. By deleting those files, he prevented that application from even launching, which prevented Natural Sapphire Company from updating the NSC Website.

42. On or about January 31, 2011, without the knowledge or authorization of Natural Sapphire Company, Telang fraudulently altered the Domain Name's WHOIS record to make himself the owner of the Domain Name.

43. The archived WHOIS records for the Domain Name show Natural Sapphire Company's Chief Executive Officer as the registrant until Telang made this change.

44. Since seizing control of the Domain Name, Telang has wrongfully used the Domain Name and other domains confusingly similar to Plaintiff's THE NATURAL SAPPHIRE COMPANY™ mark, including <NaturalSapphireCompany.net>, <TheNaturalSapphireCompany.org>, and <TheNaturalSapphireCompany.us> (the "Additional Domain Names") to:  divert visitors from Natural Sapphire Company's The Natural Sapphire Company Website; threaten Natural Sapphire Company; impersonate Natural Sapphire Company's Chief Information Officer; and re-direct users interested in

Natural Sapphire Company to websites listing links to forums in which Telang, posing as

a customer of Natural Sapphire, has posted false, disparaging, and malicious statements

about Natural Sapphire Company.

45. Telang has sent daily emails to Natural Sapphire Company threatening to destroy Natural

Sapphire Company's search engine optimization ("SEO") and boasting of how many hits

he has diverted away from the NSC Website, located at

www.TheNaturalSapphireCompany.com to Telang's websites, found at the Domain

Name and the Additional Domain Names.

46. Telang diverted over 2900 users away from Natural Sapphire Company in May 2011

alone.

47. No one but Telang would know the traffic statistics for the Domain Name.

48. On May 28, 2011, Telang wrote in an email:

> naturalsapphirecompany.com domain received 2100 unique visitors in May 2011
> its increasing at 50% you are getting butchered on SEO I am enjoying this. Your
> would be customers are cancelling buying from you after visit
> naturalsapphirecompany.com and further writing it on forums and this is just the
> beginning .......

49. Two days later, Telang followed that missive up with the following email:

> More then 2900 hits on naturalsapphirecompany in May 2011 amongst them 90%
> through direct URL typing with this domain I will finish your seo in next 3
> months you need to quickly go for appeal with three bench adjudicators.

50. On June 1, 2011, Telang further threatened in another email:

> You tried to break up my company exactly six months back Pay back time....by
> Nov I will ensure that not even a single sale happens through your web site We
> are working extra time to kill your SEO . We will put
> naturalsapphirecompany.com on the top And effectively bury your YOUR web
> site in toilet and THAT IS A PROMISE TELL THAT FAT MAN TO KEEP
> WATCHING

51. Since on or about February 2011, Telang has been openly using Natural Sapphire Company's Domain Name, which Telang hijacked, and the Additional Domain Names to damage Natural Sapphire Company's business, and then taunting Natural Sapphire Company about it.

52. Such conduct is compelling evidence of bad faith; it would be difficult to think of a more pernicious and willful set of facts.

53. Telang has also repeatedly changed the URL on Natural Sapphire Company's Wikipedia page to Telang's infringing Domain Name, all in an effort to redirect and confuse consumers searching for Plaintiff's business.

54. Telang has demanded an asking price of $100,000 to stop his course of harassment and return the Domain Name to Natural Sapphire Company.

55. Telang has also offered to sell the Domain Name to a third party—whom he believed to be a competitor of Natural Sapphire Company—for $78,000.

56. As a result of Defendants' malicious conduct, Natural Sapphire Company has suffered irreparable damage to its reputation, and has lost substantial sales.

**The UDRP Proceedings**

57. On April 1, 2011, Natural Sapphire Company filed a complaint under the Uniform Domain Name Dispute Resolution Policy ("UDRP" or the "Policy") to assert its rights to the Domain Name with the National Arbitration Forum ("NAF").

58. An NAF panel denied Natural Sapphire Company's Complaint on the basis that the dispute was beyond the scope of the Policy.

59. Natural Sapphire Company filed a second proceeding with the NAF on June 7, 2011, on the basis of new evidence.

60. A second NAF panel denied the second claim, on the basis that the newly submitted evidence only went to the issue of bad faith, and not to the issue whether the dispute was within the scope of the Policy.

61. The UDRP decisions were not on the merits, and have no precedential effect on these prodceedings.

### The Defendants' Subsequent Conduct

62. Subsequent to the commencement of this proceeding, Telang has continued his harassment and disparagement of Plaintiff through the Domain Name, the Additional Domain Names, and pseudonymous postings in online forums.

63. On or before January 2011, Telang applied to the United States Copyright Office for a copyright registration in which he claimed the existence of a copyrightable work entitled "Memosoft Software." On February 3, 2011, the Copyright Office issued a registration to TransPacific Software covering a computer program with that title.

64. On September 2, 2011, Telang through his attorney sent a notice of infringement to Nobis Technology Group, LLC ("Nobis"), who provides hosting services for the NSC Website. The notice claimed that a large number of the files making up the NSC Website infringed on TransPacific's alleged Memosoft Software copyright. The files alleged to be infringing duplicates included many files that Defendants did not create, such as the jQuery library (a set of files licensed under two open source licenses), in addition to those files Defendants did create as works-made-for-hire during their work for Natural Sapphire Company.

65. Pursuant to 17 U.S.C. § 201(b), Natural Sapphire Company is the author and owner of any copyright interests in the computer code written for it by TransPacific. Alternately,

Natural Sapphire Company holds a license to use that computer code for the purpose it was designed for, i.e. operating the NSC Website.

66. Defendants were aware of Natural Sapphire Company's rights, and chose to send an infringement notice to Nobis that misrepresented both the existence of those rights and the possible extent of TransPacific's rights in an attempt to take down Natural Sapphire Company's entire website and cripple the associated business for over a week.

67. Natural Sapphire Company has also recently learned that Telang is actively engaged in click fraud to drive up the costs of Natural Sapphire Company's Google AdWords campaign. Telang uses a proxy server to mask the identity of the clicks. Each time he clicks on one of Plaintiff's ads, Plaintiff is required to pay Google for the click.

68. Natural Sapphire Company learned of the click fraud after Telang sent the following message by email on September 13, 2011: "Off late are you guys getting hirer billi on PPC ads ha ha ha."

69. Natural Sapphire Company's Google AdWords costs have doubled since June 2011, the time Plaintiff believes Telang began engaging in click fraud.

## FIRST CAUSE OF ACTION

### [Cybersquatting Under 15 U.S.C. § 1125(d)]

70. Plaintiff realleges and incorporates by reference Paragraphs 1 through 69 as though fully set forth here.

71. Plaintiff is informed and believes, and on that basis alleges, that Defendants registered and are using the Domain Name and the Additional Domain Names.

72. The THE NATURAL SAPPHIRE COMPANY™ Mark was distinctive and entitled to protection as a common law trademark at the time that Defendants hijacked the Domain

Name and registered it in their own names, as well as the time that Defendants registered the Additional Domain Names.

73. The Domain Name and the Additional Domain Names are confusingly similar to the THE NATURAL SAPPHIRE COMPANY$^{TM}$ trademark and the <TheNaturalSapphireCompany.com> domain name. Only the word "the" differs between the Domain Name, the <naturalsapphirecompany.net> domain name, and the THE NATURAL SAPPHIRE COMPANY$^{TM}$ Mark. The <TheNaturalSapphireCompany.us> domain is identical to that mark.

74. Plaintiff is informed and believes and on that basis alleges that Defendants registered, trafficked in, or used the Domain Name and the Additional Domain Names in bad faith and with a bad faith intent to profit from the goodwill long established by Plaintiff in the THE NATURAL SAPPHIRE COMPANY$^{TM}$ Mark.

75. Plaintiff is informed and believes and on that basis alleges that Defendants registered, trafficked in, or used the Domain Name and the Additional Domain Names in bad faith and with a bad faith intent to prevent Plaintiff from registering its trademark in a domain name, and to harm the goodwill established by Plaintiff in the THE NATURAL SAPPHIRE COMPANY$^{TM}$ Mark.

76. Defendants do not have any intellectual property rights or any other rights in the THE NATURAL SAPPHIRE COMPANY$^{TM}$ Mark.

77. Plaintiff is informed and on that basis alleges that neither the Domain Name nor either of the Additional Domain Names consist of the legal name of any of the Defendants, nor a name that is otherwise commonly used to identify any Defendants.

78. Plaintiff is informed and on that basis alleges that Defendants have not made any prior

use of the Domain Name or the Additional Domain Names in connection with a *bona fide* offering of any goods or services.

79. Plaintiff is informed and on that basis alleges that Defendants have not made any *bona fide* fair use of the THE NATURAL SAPPHIRE COMPANY$^{TM}$ Mark on a website accessible under the Domain Name or the Additional Domain Names.

80. Plaintiff is informed and on that basis alleges that Defendants registered and used the Domain Name and the Additional Domain Names to divert customers from Plaintiff's website to a website accessible under the Domain Name or the Additional Domain Names, to harm and disparage Plaintiff's business, and to extort Plaintiff into paying Defendants an exorbitant sum to cease their harassment.

81. Defendants' registration, use, or trafficking in the Domain Name and the Additional Domain Names constitutes cybersquatting in violation of 15 U.S.C. § 1125(d), entitling Plaintiff to relief.

82. By reason of Defendants' acts alleged herein, Plaintiff's remedy at law is not adequate to compensate it for the injuries inflicted by Defendants. Accordingly, Plaintiff is entitled to preliminary and permanent injunctive relief pursuant to 15. U.S.C. § 1116.

83. By reason of Defendants' acts alleged herein, Plaintiff is entitled to recover Defendants' profits, actual damages and the costs of action, or statutory damages under 15 U.S.C. § 1117, on election by Plaintiff, in an amount of one hundred thousand dollars ($100,000) per domain name infringement.

84. This is an exceptional case, making Plaintiff eligible for an award of attorneys' fees under 15 U.S.C. § 1117.

## SECOND CAUSE OF ACTION

### [Common Law Defamation and Trade Libel]

85. Plaintiff realleges and incorporates by reference Paragraphs 1 through 84 as though fully
set forth here.

86. Defendants have intentionally posted knowingly false statements about Plaintiff and its
products on various blogs and forums, as well as on the websites located at
www.NaturalSapphireCompany.com, www.NaturalSapphireCompany.net, and
www.TheNaturalSapphireCompany.us.

87. These statements were made maliciously and willfully, and were intended to cause harm
to Plaintiff's business and reputation.

88. Among other statements, Defendants have posed as customers on chat forums, falsely
accused Plaintiff of grossly overcharging customers, selling inferior merchandise,
committing fraud, breaching credit card confidentiality, photoshopping images of gem
stones, and engaging in criminal conduct.

89. These statements were false, and were published to third parties across the Internet.

90. As a result of Defendants' acts, Plaintiff has suffered irreparable damage to its reputation
and further damages in the form of lost sales and profits, in an amount to be determined
at trial.

91. As a result of the willful and malicious nature of the defamation, Plaintiff is entitled to
punitive damages.

## THIRD CAUSE OF ACTION

### [17 U.S.C. § 512(f) MISREPRESENTATION]

92. Plaintiff realleges and incorporates by reference Paragraphs 1 through 91 as though fully

set forth here.

93. Defendants knew that the hosting of the files comprising the NSC Website did not infringe any copyrights in which Defendants have or had any interest.

94. In their takedown notice of September 2, 2011, purportedly issued under the authority of 17 U.S.C. § 512, Defendants knowingly materially misrepresented that the hosting of the NSC Website files was an infringement of a valid copyright interest.

95. Plaintiff has been injured by the misrepresentation in that Nobis Technology Group, LLC, its service provider, relied upon Defendants' misrepresentation and threatened to disable access to the entire NSC Website for a period of ten days, which required Plaintiff to take emergency steps to re-architect and relocate the NSC Website.

96. As a result of Defendant's acts, Plaintiff has incurred attorneys' fees of at least $1,500 suffered monetary damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### [Tortious Interference with Prospective Economic Advantage]

97. Plaintiff realleges and incorporates by reference Paragraphs 1 through 96 as though fully set forth here.

98. Plaintiff has a reasonable business expectancy of selling sapphire rings and jewelry to consumers who search for Plaintiff's name, "The Natural Sapphire Company," or "Natural Sapphire Company," on the Internet.

99. Defendants knew of that expectancy, and intentionally posted false and misleading statements about Plaintiff and its products on various blogs and forums, as well as on the website, located at www.NaturalSapphireCompany.com, with the intent of deliberately

interfering with these clients and their business relationship with Plaintiff.

100. These statements were made maliciously and willfully, and were intended to cause harm to Plaintiff's business and reputation, and to prevent Plaintiff from making sales to customers who sought Plaintiff out based on Plaintiff's reputation as a source for high quality sapphires.

101. Among other statements, Defendants have posed as customers on chat forums, falsely accused Plaintiff of grossly overcharging customers, selling inferior merchandise, committing fraud, breaching credit card confidentiality, photoshopping images of gem stones, and engaging in criminal conduct—all with the intent of destroying Plaintiff's business.

102. As a result of Defendants' acts, Plaintiff has suffered irreparable damage to its reputation and damages in an amount to be determined at trial.

103. As a result of the willful and malicious nature of Defendants' conduct, Plaintiff is entitled to punitive damages.

## FIFTH CAUSE OF ACTION

### [Fraudulent Misrepresentation]

104. Plaintiff realleges and incorporates by reference Paragraphs 1 through 103 as though fully set forth here.

105. Defendants knew that Natural Sapphire Company utilizes the pay-per-click model of Google AdWords advertising both because of their general experience as web developers familiar with the operations of the AdWords system and because of their specific experience as former developers and consultants for Plaintiff. Accordingly, Defendants knew that additional clicks on Plaintiff's AdWords ads would result in increased

advertising costs for Plaintiff.

106. By generating fraudulent clicks on Plaintiff's ads, Defendants represented to Plaintiff that each of those clicks was a legitimate indication of interest in accessing Plaintiff's NSC Website.

107. Defendants knew such representations were false and that their clicks did not in fact express any legitimate interest in accessing the NSC Website.

108. Defendants' misrepresentations to Plaintiffs through their fraudulently-generated clicks were intentional and made with scienter in an effort to induce Plaintiff to increase its AdWords expenditure and expect an ensuing increase in legitimate traffic and sales activity on the NSC Website.

109. Plaintiffs relied on Defendants' misrepresentations as to the legitimacy of the clicks fraudulently generated by Defendants by paying their increased AdWords invoices and expecting increased traffic and sales through the NSC Website.

110. Plaintiff's reliance on Defendants' misrepresentations was reasonable because Google takes reasonable measures to protect the integrity of the AdWords system and detect fraudulent activity, and thus Plaintiff had a legitimate expectation that the clicks it was charged for through that system were legitimate.

111. As a direct result of Defendants' fraudulent conduct, Plaintiff has been damaged in an amount to be proven at trial.

## SIXTH CAUSE OF ACTION

### [Prima Facie Tort]

112. Plaintiff realleges and incorporates by reference Paragraphs 1 through 111 as though fully set forth here.

113. The act of clicking on Google AdWords displayed on a website is generally legal.

114. Defendants intentionally engineered an anonymized system of automated clicking on Plaintiff's AdWords, which they designed to evade Google's processes for detecting and ignoring such automated clicks.

115. Defendants knew such a system would inflict direct harm on Plaintiff by inflating its advertising costs.

116. Defendants have no excuse or justification for their conduct.

117. Plaintiff has suffered specific damages of at least $30,000 as a result of Defendant's automated clicks.


**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendants awarding Natural Sapphire Company:

1.      statutory damages for cybersquatting in the amount of $300,000;

2.      actual damages in an amount to be determined at trial due to commercial defamation and trade libel;

3.      actual damages in an amount to be determined at trial due to misrepresentation of infringement in violation of 17 U.S.C. § 512(f);

4.      actual damages in an amount to be determined at trial due to tortious interference with prospective economic advantage;

5.      actual damages in an amount to be determined at trial due to fraudulent misrepresentation;

6.      actual damages in an amount to be determined at trial due to prima facie tort;

7.      punitive damages;

8.      attorney's fees and costs; and

9.      such other relief as the Court deems just and equitable under the

circumstances.

Dated:  October 17, 2011

Respectfully submitted,

Lewis & Lin, LLC


_____
Brett E. Lewis

Attorneys for Plaintiff
Walter Arnstein, Inc.,
d/b/a The Natural Sapphire Company

## DEMAND FOR TRIAL BY JURY

Please take notice that Plaintiff, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, hereby demands trial by jury for all issues so triable.

Dated:  October 17, 2011.

Respectfully submitted,

Lewis & Lin, LLC

Brett E. Lewis

Attorneys for Plaintiff
Walter Arnstein, Inc.,
  d/b/a The Natural Sapphire Company